## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## LAFAYETTE DIVISION

Simar                                    Civil Action 15-01950

versus                                   Magistrate Judge Carol B. Whitehurst

Tetra Technologies Inc, et al                    By Consent of the Parties

## MEMORANDUM RULING

Before the Court are a Motion For Summary Judgment filed by Third Party Defendants, CB&I Offshore Services, Inc. ("CB&I") and Starr Indemnity and Liability Company ("Starr") [Rec. Doc. 47-2], a Memorandum In Opposition filed by Defendants, Tetra Technologies, Inc. ("Tetra") and Maritech Resources, LLC's ("Maritech") (referred to collectively as "Tetra/Maritech")[Rec. Doc. 63], CB&I and Starr's Reply [Rec. Doc. 71] and a Sur-reply filed by Tetra and Maritech [Rec. Doc. 82].

### I. Factual Background

This matter arises from injuries allegedly sustained by Plaintiff, Wendell Simar, on June 24, 2014, while employed by CB&I as a rigger assigned to perform construction work on a production platform designated as Vermilion VR 250-C (referred to as "VR 250-C " or "Platform"). *R. 47-3, Plaintiff's Depo., p. 22; R. 1, ¶¶7-8.* The VR 250-C is a fixed platform located approximately 66 miles from the nearest Louisiana shoreline owned/operated by Tetra/Maritech. *R. 1, ¶¶7-9.* Plaintiff alleges he was injured during an attempted swing rope transfer from the platform to a nearby vessel when the steel cable section of the swing rope parted causing him to fall into the water. *R. 18, p. 3.*

Tetra/Maritech and CB&I entered into a Master Service Agreement (the "MSA") dated March 22, 2013, under which Tetra/Maritech would periodically contact CB&I to discuss a particular operation and request personnel for that specific operation. *R. 1.* The MSA required CB&I to indemnify Tetra/Maritech for injuries sustained by CB&I's employees while working for Tetra/Maritech. *R. 47-4.* Prior to June 24, 2014, CB&I was contacted by Tetra/Maritech and asked to provide personnel to perform general construction services on the VR 250-C Platform. *R. 47-7, Barousse Aff.* CB&I agreed to provide personnel for this operation pursuant to a verbal "callout" agreement (sometimes referred to as "the Agreement") and the terms of the blanket MSA. *R. 47-7.* CB&I personnel were contracted to engage in welding, rigging, setting up and handling equipment, buffing, fabricating, repairing and replacing handrails and grating. *R. 47-3, p. 131.* Tetra/Maritech advised CB&I that this work was necessary to bring the platform into regulatory compliance following a series of regulatory citations so that it could be removed. *Id., pp. 42-43, 141, 162; R. 47-7, ¶ 5[1]; 47-11, p. 2.*

In order to transport and house the CB&I personnel and stage equipment at the fixed platform worksite, Tetra/Maritech chartered a vessel from Supreme Offshore Services (the "Supreme vessel"). *R. 47-10.* CB&I personnel were not assigned to the vessel, *R. 42-7,* and did not participate in vessel safety drills, *R. 47-8*, or assist in vessel operations, *R. 47-3, p. 181.* CB&I personnel made use of the vessel to transport and house personnel and stage equipment at the fixed platform worksite. *R. 47-3, p.*

---

[1] At the time of his Affidavit, Rusty Barousse had been the Vice President of CB&I since July 2001. *R. 47-7.*

*181.* Ninety-five percent of the work was performed on the fixed platform. *R. 47-3, pp. 134, 141, 144, R. 23, ¶9.*

Plaintiff, Wendell Simar, filed this action on June 23, 2015. In his Complaint, Plaintiff named as defendants, Tetra/Maritech, the platform owner, and Supreme, the owner/operator of the vessel involved in the transfer. Tetra/Maritech filed a Third-Party demand seeking defense, indemnity and/or insurance coverage from Plaintiff's employer, CB&I, and its insurer, Starr. *R. 23.* Tetra/Maritech's demand is based in the contractual defense, indemnification and/or insurance coverage provisions contained in a Master Service Agreement dated March 22, 2013, between Shaw Global Offshore Services and Tetra/Maritech ("MSA"). *R. 47-4, Master Service Agreement.*[2] The MSA provided in pertinent part:

9.2(a)      Contractor [i.e., CB&I Offshore Services, Inc.] shall release, defend, indemnify and hold harmless Company Group[3] from and against any and all Claims for personal or bodily injury to, sickness, disease or death of any member of Contractor Group arising out of the performance of this Agreement or any Order, *REGARDLESS OF FAULT*.

The MSA also required CB&I to furnish primary liability insurance endorsed to name Tetra/Maritech as additional insureds and to provide insurance protection for all risks, liabilities, and obligations assumed. *R. 23, ¶ 12.* CB&I filed this motion for summary judgment asking the Court to dismiss the complaint because the Louisiana Oilfield Anti-Indemnity Act ("LOIA") voids coverage.

---

[2] The MSA was subsequently amended to include CB&I as the successor of Shaw.

[3] CB&I stipulated Tetra/Maritech are members of the Company Group referenced above. *R. 47-2, p. 7.*

## II. Summary Judgment Standard

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a). If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, (1986); *see also Lavespere v. Liberty Mut. Ins*. Co., 910 F.2d 167, 178 (5th Cir.1990). Once the moving party carries its burden pursuant to Rule 56(a), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324; *Auguster v. Vermillion Parish School Bd.*, 249 F.3d 400, 402 (5th Cir.2001). In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws all reasonable inferences in his favor. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). The Court does "not ... in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *Badon v. R J R Nabisco, Inc.*, 224 F.3d 382, 393–94 (5th Cir. 2000). Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion." *Boudreaux v. Banctec, Inc.*, 366 F. Supp. 2d

425, 430 (E.D. La. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## III. Analysis

In the Indemnity provision of the MSA, CB&I agreed to indemnify and defend Tetra/Maritech for claims such as Simar's. CB&I now asserts that the indemnity provision is barred under LOIA. In particular CB&I contends that because the MSA involved activities aboard fixed Outer Continental Shelf ("OCS") platforms adjacent to the Louisiana coast, and pertained to a well, Tetra/Maritech's demand for defense and indemnity and insurance coverage under the MSA is unenforceable under LOIA.

Tetra/Maritech argues that issues of fact preclude summary judgment. Tetra/Maritech enumerates those issues as: (1) whether CB&I's work was primarily performed on the OCS as opposed to state territorial waters[4]; (2) whether the work under the MSA was governed by maritime law of its own force based on the use of the vessel; and (3) whether the work pursuant to the MSA pertained to a well within the meaning of the LOIA. The Court will consider these issues as follows.

A.    *Whether Louisiana Law Applies As Surrogate Law Under The Outer Continental Shelf Lands Act ("OCSLA")*

In its Motion, CB&I asserts that by virtue of the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq. ("OCSLA"), the law of the adjacent state (Louisiana) applies to this controversy.   CB&I argues that Louisiana law, specifically the Louisiana Oilfield Indemnity Statute, La.Rev.Stat. § 9:2780 ("LOIA"), renders

---

[4] The MSA includes a choice of law provision reciting that controversies arising under the contract shall be governed by Texas law. Thus, subjecting the MSA to Louisiana law and the LOIA is through the OCSLA.

invalid the indemnity provisions contained within the MSA. To determine when "adjacent state" law applies, the Court utilizes the test employed in *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir.1990) ("*PLT* test"). Under the *PLT* test three requirements must be met for state law to apply as surrogate federal law under the OCSLA: (1) the controversy must arise on a situs covered by OCSLA (i.e., the subsoil, seabed, or artificial structures permanently or temporarily attached thereto); (2) federal maritime law must not apply of its own force; and (3) the state law must not be inconsistent with federal law. *See Tetra Technologies, Inc. v. Continental Ins. Co.*, 814 F.3d 733, 738 (5th Cir. 2016).

In this case, the controversy is the plaintiff's claim for injuries he sustained while working for CB&I on the VR 230-C platform. CB&I contends that all the work was performed on the  Platform which was located on the Outer Continental Shelf (OCS), 66 miles off the coast of Louisiana. Tetra/Maritech argues that genuine issues are in dispute as to whether the majority of the work was performed on the OCS.

*1. Whether There is an OCSLA Situs*

"Under the first requirement of the PLT test, "the controversy at issue must arise on an OCSLA situs, namely the seabed, subsoil, and fixed structures of the outer Continental Shelf." *Tetra Technologies, Inc. v. Continental Ins.* Co., 814 F.3d 733, 738 (C.A.5 (La.),2016). When the dispute pertains to a contractual demand for defense and indemnity, the Fifth Circuit applies a focus-of-the-contract test to determine whether a controversy arises on an OCSLA situs. *Id. citing Grand Isle Shipyard*. Under the focus-of-the-contract test, "a contractual indemnity claim (or any

other contractual dispute) arises on an OCSLA situs if a majority of the performance called for under the contract is to be performed on stationary platforms or other OCSLA situses enumerated in 43 U.S.C. § 1333(a)(2)(A)." *Id. at 878-88.*

"[I]t is a common practice for companies contracting for work in the oilfield to enter into contracts in two stages," first signing a blanket contract and then "issu[ing] work orders for the performance of specific work." *Id.* Here, Tetra and CB&I followed this common practice: first entering into the MSA, which functions as a "blanket agreement" between the parties, and then Tetra issuing specific work orders for the completion of particular tasks. In a situation "where the contract consists of two parts, a blanket contract followed by later work order, the two must be interpreted together." *Id.* But generally, "in determining situs in a contract case such as this, courts should ordinarily look to the location where the work is to be performed pursuant to the specific work order rather than the long term blanket contract." *Id.*

CB&I asserts that ninety-five percent (95%) of the work was performed on the platform.[5] *R. 47-3, Simar Depo, pp. 134, 141, 144; R. 23,¶ 9.* Specifically, CB&I personnel were contracted to engage in welding, rigging, setting up and handling equipment, buffing, fabricating, repairing and replacing handrails and grating. *Id. at p. 131.* Tetra/Maritech advised CB&I that this work was necessary to bring the

---

[5] "Probably ninety-five percent on the platform. Hardly anything on the boat." *R. 47-3, Simar Depo, p. 134.*

platform into regulatory compliance following a series of regulatory citations[6] and so that salvage and removal operations of the oil well platform could continue. *Id., pp. 42-43, 141, 162; R. 42-7, Barousse Aff., ¶ 5; 47-11, p.2.*

Tetra/Maritech states "[t]here is no dispute about the fact that the majority of the work contemplated by the [] MSA was to be performed on fixed platforms." *R. 63, p. 9.* Tetra/Maritech disputes, however, that CB&I has established that the majority of the work on the platforms was on the OCS rather than in state territorial waters. *Id.* The Court disagrees. As provided by the evidence cited above, the Agreement specifically pertained to the particular job in which CB&I's personnel were required to provide necessary repairs preparatory to the removal of the VR 250-C, a fixed platform 66 miles from the Louisiana coast on the OCS. *R. 47-7, Barousse Aff., ¶ 5; 47-11.*[7] This evidence is substantiated by the Department of the Interior, Bureau of Ocean Energy Management, Environment Documents Prepared for Oil, Gas and Mineral Operations by the Gulf of Mexico Outer Continental Shelf (OCS) Region, 77 FR 74215 (Dec. 13, 2012) which notices "Maritech Resources, Inc., Structure Removal ... on Vermilion, Block 250, Lease OCS_G 23670, located 66 miles from the nearest Louisiana shoreline." *R. 47-14.* The Court finds that the focus of the contract at issue pertains to work performed on an OCSLA situs in compliance

---

[6] "MMS had gone and written up some issues concerning stairwell treads and handrails and grating" *R. 47-7, p.*

[7] The correspondence from counsel for Tetra/Maritech to counsel for CB&I refers to "a contract for general construction activities on a fixed OCS platform structure...."

with *Grand Isle Shipyard.*

### 2. Whether Maritime Law Applies Of Its Own Force

To determine whether federal maritime law applies of its own force the Fifth Circuit employs the two-pronged test of *Davis & Sons, Inc. v. Gulf Oil Corp*, 919 F.2d 313, 315 (5th Cir. 1990). The first prong examines the historical treatment of the particular type of contract at issue. The second prong is a six-factor inquiry into the nature of the work actually performed.[8]

### a. Historical Treatment

CB&I contends that the historical treatment is that general construction activities on fixed OCS platforms are non-maritime in nature. *R. 47-2, p. 11,* citing *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 421 (U.S.La.,1985); *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.*, 754 F.2d 1223, 1231 (5th Cir. 1985); *Wagner v. McDermott, Inc.*, 79 F.3d 20 (5th Cir. 1996). The Court agrees. *See Hufnagel v. Omega Serv. Indus., Inc.*, 182 F.3d 340, 352 (5th Cir.1999),("Construction work on fixed offshore platforms bears no significant relation to traditional maritime activity."); *see also ACE American Ins. Co. v. Freeport Welding & Fabricating, Inc.*, 699 F.3d 832 (5th Cir. 2012) (holding that maritime law did not apply of its own force where "the relevant contract ... was performed on a stationary platform"); *Grand Isle,* 589 F.3d at 789 (agreeing with the district court's conclusion that contract, "which

---

[8] (l) What does the specific work order in effect at the time of the injury provide?; (2) What work did the crew assigned under the work order actually do? (3) Was the crew assigned to work aboard a vessel in navigable waters? (4) To what extent did the work being done relate to the mission of that vessel? (5)What was the principal work of the injured worker? (6) What work was the injured worker actually doing at the time of his injury? *Tetra* at 741.

called for maintenance work on a stationary platform located on the OCS," was not a maritime contract).

Here, it is undisputed that all of the work contracted under the MSA and the oral callout order (the "Agreement") was for repair and construction work to bring the fixed platform to code in order to continue the removal of the platform. It appears self-evident that these services have little if anything to do with traditional maritime activity or commerce, but rather are services peculiar to the oil and gas industry, whether conducted on or offshore. The Court, however, must also consider the use of the Supreme vessel in making this determination. CB&I contends that the only use of a vessel contemplated by the parties was the "incidental" use as a means for transporting and housing personnel, material and welding equipment adjacent to the fixed OCS platform where the work was performed. *R. 47-7, Barousse Aff., ¶ 9.*

Tetra/Maritech argues that the plaintiff's deposition testimony disputes CB&I's position that the vessel was only chartered for incidental use. Citing the plaintiff's testimony that pieces of grating were cut on the vessel and transferred to the platform for installation, Tetra/Maritech suggests that work was, in fact, done on the vessel. *R. 47-3, pp. 159-160.* Tetra/Maritech also suggests that one of the vessel's purposes was to have a place to put the equipment in order for the work to be done on the platform. *Id.* In his deposition, the plaintiff, Wendell Simar, confirmed there was a welding machine on the vessel which was used to do the welding on the platform:

> Q: And would one of the reasons the work boat was out there was to have a place to put the equipment so that whatever work you did on the platform could be done, correct?

A: Yes.

Q: All right. And it was very, very common for the welders to drag their leads from the vessel over to the platform and then use the welding machine while it was located on the vessel to do the welding on the platform? Right?

A: Yes.

*Id.*

Tetra/Maritech further points to the recent Fifth Circuit decision, *In re Larry Doiron, Incorporated*, 2017 WL 3638406 (5th Cir. 2017), a revised and superceded opinion on which the court granted a rehearing en banc which remains pending. In *Doiron*, the platform owner hired the contractor to provide employees to perform flow-back services on its offshore well. The work was to be performed on the fixed production platform. Shortly after the work began, it was determined that larger equipment would be necessary to perform the operation. In order to remove the larger equipment from the wellhead, the platform owner was required to contract for a crane barge to remove the heavy equipment. After the flow-back was completed, during the rigging down process, a worker was injured when he fell from the crane onto the deck of the crane barge.

The court concluded that the contract was maritime in nature, even though a majority of the injured worker's duties were to be performed on the platform. The court's opinion turned on the fact that even though the workers were not assigned to work aboard the crane barge, they "made use of the barge by loading and unloading equipment from its deck, conducting safety meetings on board the vessel, and using the crane to install large equipment on the platform." *Id. at *4.* The court stated that

11

the gravamen of their inquiry was not whether the contract required use of a vessel but whether the *execution* of the contract required a vessel. *Id. at \*5* (emphasis in original).

CB&I cites *BJ Services Co., USA v. Thompson*, 2010 WL 2024725 (E.D. La., 2014) in support of its position that the contract in this case is non-maritime. There, the owner/operator of the fixed OCS platform contracted for a lift boat which provided a "necessary" crane and living quarters. *Id at \*1*. The court concluded that the MSA was not maritime in nature and LOIA applied despite the necessary use of a vessel. Because *BJ Services* was decided before the Fifth Circuit decided *Doiron* and involved a scenario similar to that in *Doiron*, it does not assist the Court. Accordingly, the Court will examine the cases cited in the analysis in *Doiron* regarding the historical treatment in this case.

In *Devon Louisiana Corporation v. Petra Consultants, Inc.*, the Fifth Circuit undertook an examination of whether a contract to repair a fixed platform was a maritime contract. 247 Fed.Appx. 539 (5th Cir.2007). Because the Court had not previously considered that question, it found the first prong of the *Davis* analysis (i.e. an examination of the "historical treatment") to be "inconclusive." *Id*. at 544; see also *Hoda v. Rowan Companies, Inc.*, 419 F.3d 379, 381 (5th Cir.2005) ("in some circumstances, though not here, the historical treatment is clear enough to make the second part of the test 'unimportant.' "). In conducting its analysis, the *Devon* Court provided the following overview of the pertinent jurisprudence:

> We ... held in *Domingue v. Ocean Drilling & Exploration Co.*, 923 F.2d 393, 397 (5th Cir.1991), that where a contract is only incidentally

related to a vessel's mission, it is not maritime. *Domingue* involved a contract for wireline services on an offshore well. The work order required the crew to use a jack-up drilling rig. Although a jack-up rig has been classified as a vessel for maritime law purposes, in *Domingue* the use of a vessel was purely incidental to the execution of the contract, and nothing about the contract required that the contractor use a vessel instead of a mere work platform.

In contrast, the work in *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1123 (5th Cir.1992), required the use of a vessel as such. Campbell involved casing work that required the use of a vessel such as a jack-up rig, along with its derrick and draw works, because there was no fixed platform or derrick at the work site. Similarly, in *Davis* we noted that the "particular nature of the terrain and production equipment required" the use of a vessel. Davis involved a work crew that traveled from one offshore job site to another and made various repairs to the offshore facilities and thus required a vessel "that could function as a mobile work platform."

In *Hoda*, ... we addressed an analogous situation in which the crew's "exact work did not require the use of [a] vessel," but the work "could not be performed without the [vessel's] direct involvement." *Hoda* involved the torquing up and down of the bolts on blowout preventer stacks, a task that by itself did not require the use of the vessel or its crew but that would have been irrelevant and impossible if the vessel's crew had not used the vessel's rig to set the stacks and bolts in place.

*Devon* at 544–45.

The *Devon* court ultimately determined the contract before it was a maritime contract,

reasoning:

Although the "exact work" on the punch list did not require the use of a vessel per se, the failure of the parties to obtain a hot work permit meant that the welding work, which was a prerequisite for completing some of the tasks on the punch list, had to be completed on a vessel, not the fixed platform .... The contract here required that the parties provide a vessel per se, because only a vessel working alongside the already existing fixed platform could provide a suitable place to perform the hot work. As was the case in *Davis*, *Campbell*, and *Hoda*, the instant contract required that a vessel be provided.

It is undisputed that the hot work could have been completed on the oil and gas platform if the appropriate permit had been obtained. The inability to perform the hot work on the vessel was not caused by any physical or technical limitations but by the legal limitations resulting from the absence of a permit. That is, however, a distinction without a legal difference. *Hoda*, *Davis*, and *Campbell* do not require that the need for a vessel be caused by physical or technical limitations. There is no practical difference between having to use a vessel because of physical realities and having to use one because of legal restrictions. A vessel is required in both situations.

The jurisprudence therefore indicates that where the use of a vessel as such is required for completion of the contract, maritime law appropriately governs.

*Id*. at 545.

The Court finds that the facts of *Domingue* are more analogous to this case than the other cases cited above. Because *Domingue* involved wire line services and a jack-up drilling rig, however, it is not historically clear to make the second part of the *Davis* test unimportant.

### b. Davis Factors

Based on the undisputed evidence provided in the foregoing, the Court will address the six factor test set forth in *Davis* as follows.

*1. What does the specific work order in effect at the time of injury provide?*

*2. What work did the crew assigned under the work order actually do?*

The parties agree that Tetra/Maritech hired CB&I to perform general construction and/or welding services in a repair operation on a fixed platform on the OCS preparatory to removal of the platform structures. *R. 47-1, ¶ 6; R. 47-11.* Additionally, it is undisputed that the work crew was contractually tasked with "welding, rigging, setting up and handling equipment, buffing, fabricating, repairing

14

and replacing handrails and grating on the production platform stairs and performing similar general safety work preparatory to the removal of platform structures." *Id., R. 47-2, p. 9*; *R. 47-3, pp. 131, 135, 137.*

### 3. Was the crew assigned to work aboard a vessel in navigable waters?

The CB&I work crew was assigned to work aboard VR 250-C a fixed platform in the OCS. The CB&I work crew was not assigned to work aboard a vessel in navigable waters. The plaintiff testified that CB&I employees performed no more than 5% of their work on or from the Supreme vessel. *47-3, pp. 134, 142,144.* Citing the plaintiff's testimony that "[workers] would cut grating on the deck of the vessel and they would hand them to us [on the platform]" and "a couple of welding machines [were on the vessel]. We had a spare," *63-2, p159,* Tetra contends that the vessel was used to perform work and as a place to put equipment so that the work could be done on the platform.

### 4. To what extent did the work being done relate to the mission of that vessel?

According to CB&I, the services provided by his crew did not relate to the mission of any vessel, including the Supreme vessel. That vessel was for the transportation, housing and staging of equipment and personnel at the fixed platform worksite. CB&I was not tasked with providing vessel crew members and no CB&I employee was assigned to a vessel. *R. 47-7, Barousse Aff, ¶ 8.* No CB&I personnel participated in vessel safety drills or safety meetings, *R. 47-9, Safety Meeting Details–6/10/14-7/6/14, pp. 42-43.*

*5. What was the principal work of the injured worker?*

Wendell Simon's principal work as a rigger was to perform general repairs on the fixed platform in order to bring it into compliance so that dismantling could be completed.

*6. What work was the injured worker actually doing at the time of injury?*

At the time of his injury, Wendell Simar was in the process of transferring via swing rope from the platform to the Supreme vessel when the steel cable section of the swing rope parted causing him to fall into the water. *R. 1*.

The Court concludes, after a review of the historical treatment, applicable jurisprudence, and evidence in the record, that the contract between Tetra/Maritech and CB&I is a non-maritime contract. The work for which CB&I was retained—to perform general construction and/or welding services—was one that did not require the use of the Supreme vessel nor any vessel. The crew's use of the vessel constituted no more than 5% of the work performed. The vessel could have been completely eliminated and the crew would still have been able to do their work. There is no evidence that the workers were prevented from cutting grating on the platform nor that the welding machine could not have been placed on the platform. Even with the welding machine on the vessel, however, the workers performed their welding jobs on the platform. The Supreme vessel was chartered to transport, house and stage the equipment and personnel at the fixed platform worksite where 95% of the work was conducted. Because certain workers chose to cut grating on the vessel and then use it to make repairs on the platform does not make the contract maritime.

The Court therefore finds in this case, as did the court in *Domingue*, that the use of the vessel was purely incidental to the execution of the contract, and nothing about the contract nor the circumstances surrounding the Agreement required that the contractor use the vessel instead of the work platform. *Domingue*, 923 F.2d at 397.

### 3. Whether the State Law is Consistent With Federal Law

As the Court has determined the first two prongs of *PLT* are met, the Court must consider *PLT's* third prong, *"*[t]he state law must not be inconsistent with Federal law." *PLT*, 895 F.2d at 1047. Nothing in LOIA is inconsistent with federal law, *see Grand Isle*, 589 F.3d at 789 (agreeing with district court's conclusion that this court "has specifically held that nothing in LOIA is inconsistent with federal law") and Tetra/Maritech does not argue otherwise. *See Strong v. B.P. Expl. & Prod., Inc.*, 440 F.3d 665, 668 (5th Cir.2006) ("By not contesting [plaintiff's] arguments that [PLT's second and third requirements] are satisfied, B.P. implicitly concedes that those conditions have been met.").

Thus, the Court concludes that *PLT's* third prong is satisfied and the law of Louisiana applies to this controversy. Because all three parts of the *PLT* test regarding the applicability of State law under OCSLA are met in this case, the Court must apply the law of the adjacent State to this controversy. It is undisputed that Louisiana is the adjacent state to platform VR 250-C; therefore, its law shall guide this Court in its decision. The Court looks to Louisiana law despite the Texas choice of law clause in the MSA. While a contractual choice of law provision is one factor that the Court considers in determining applicable law, the jurisprudence holds that OCSLA is a

trump card in the game of choice of law. *See PLT*, 895 F.2d at 1050 ("We find it beyond any doubt that OCSLA is itself a Congressionally mandated choice of law provision requiring that the substantive law of the adjacent state is to apply even in the presence of a choice of law provision in the contract to the contrary."); *Matte*, 784 F.2d at 631 (concluding that a choice of law provision in a Master Service Agreement "violates federal policy expressed in the Lands Act, which seeks to apply the substantive law of the adjacent state to problems arising on the Shelf").

*B. The Louisiana Oilfield Indemnity Act ("LOIA") La.R.S. § 9:2780*

*1. Whether The Agreement "Pertains to a Well" Within the Meaning of LOIA*

Since OCSLA requires the adoption of Louisiana law as surrogate federal law, the next question is whether LOIA applies to this dispute. LOIA provides, in relevant part:

> A. The legislature finds that an inequity is foisted on certain contractors and their employees by the defense or indemnity provisions, either or both, contained in some agreements pertaining to wells for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, to the extent those provisions apply to death or bodily injury to persons. It is the intent of the legislature by this Section to declare null and void and against public policy of the state of Louisiana any provision in any agreement which requires defense and/or indemnification, for death or bodily injury to persons, where there is negligence or fault (strict liability) on the part of the indemnitee, or an agent or employee of the indemnitee, or an independent contractor who is directly responsible to the indemnitee.
>
> B. Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent

18

negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

C. The term "agreement," as it pertains to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, as used in this Section, means any agreement or understanding, written or oral, concerning any operations related to the exploration, development, production, or transportation of oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, including but not limited to drilling, deepening, reworking, repairing, improving, testing, treating, perforating, acidizing, logging, conditioning, altering, plugging, or otherwise rendering services in or in connection with any well....

. . .

G. Any provision in any agreement arising out of the operations, services, or activities listed in Subsection C of this Section of the Louisiana Revised Statutes of 1950 which requires waivers of subrogation, additional named insured endorsements, or any other form of insurance protection which would frustrate or circumvent the prohibitions of this Section, shall be null and void and of no force and effect.

...

Thus, if LOIA applies, it will void CB&I's defense, indemnity and/or insurance obligations.

"The Fifth Circuit has adopted a two-part test to determine if LOIA applies. First, there must be an agreement that pertains to an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends. In determining whether an agreement pertains to a well, the decisive factor in most cases has been the functional nexus between an agreement and a well or wells.

If the agreement has the required nexus to a well, the court examines the contract's involvement with operations related to the exploration, development,

production, or transportation of oil, gas, or water. Thus, if (but only if) the agreement (1) pertains to a well and (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement. This inquiry requires a fact intensive case by case analysis." *Tetra Technologies, Inc. v. Continental Ins.* Co., 814 F.3d 733, 743 (5th Cir. 2016)

In *Tetra Technologies*, Tetra entered into an agreement to salvage a decommissioned oil production platform. Tetra retained Vertex to perform some aspects of the salvage operation. One of Vertex's workers was injured working from a Tetra-owned barge. The Fifth Circuit dismissed the "fact intensive" inquiry and held that the question of whether an agreement for work on a dismantled drilling platform has a sufficient nexus to a well for LOIA to apply, was "one of law." The court recognized that LOIA applies to "agreements to perform work in connection with plugging and abandoning the wells at issue" and therefore must "apply to a nonproducing well." *Id.* at 746 (citing La.Rev.Stat. Ann. § 9:2780(C) (including plugging or "any act collateral thereto" as activities pertaining to a well)). Ultimately, the court concluded that a contract for salvaging a decommissioned platform is collateral to plugging or decommissioning the well because the regulations generally require the removal of an oil platform in connection with a decommissioning operation. *See* 30 C.F.R. § 250.1703 (listing general requirements for decommissioning) ("When your facilities are no longer useful for operations, you must ... [r]emove all platforms and other facilities, except as provided in §§ 250.1725(a) and 250.1730...."). *Id.* Thus, the court

held that because the contract for salvaging the platform from a decommissioned oil well has a sufficient nexus to a well under LOIA, the indemnity obligations at issue would be voided.

CB&I contends that *Tetra Technologies*' rule that a contract for salvaging a platform related to a decommissioned oil well has a sufficient nexus to a well under LOIA also covers the contract in this case. Here, Tetra/Maritech advised CB&I that the work it was hired to perform on the VR 250-C Platform was necessary to bring the platform into regulatory compliance, following a series of regulatory citations, before it could be removed. *R. 47-1, Undisputed Fact No. 10.*[9] None-the-less, Tetra/Maritech contends that genuine disputes of facts exist as to whether the work done by CB&I was required by regulations and whether such work was related to the deconstruction or removal of a platform or a well. Tetra/Maritech maintains that *Tetra Technologies*, does not apply in this case because CB&I was engaged to perform repair work, not to deconstruct or remove the structures. Tetra/Maritech argues that the Court should conduct an analysis using the ten specific factors of *Transcontinental Gas Pipe Line Corp. v. Transportation Insurance Company*, 953 F.2d 985, 991 (5th Cir. 1992).

The record clearly confirms that at the time CB&I was engaged to work on the VR 250-C Platform it was ready to be disassembled pursuant to the applicable federal regulations. The U.S. Department of the Interior, Bureau of Ocean Energy Manage-

_____

[9] Tetra/Maritech did not object to CB&I's statement of fact No. 10. Tetra/Maritech made the general statement as to the issue of whether the contract pertained to a well: "Whether the contract work in question had a functional and geographic nexus with an identifiable well." *R. 63-1, undisputed Fact in Opposition No. 3.*

ment's Final Environmental Assessment, Structure-Removal Applications of

Vermilion 250-C Platform dated August 2012 states in pertinent part:

> Maritech Resources, Inc. proposes to remove Platform [] C .... The operator will remove all casing, wellhead equipment, and piling.... Maritech Resources, Inc.'s structure removal permit applications include additional information about the proposed activities and is incorporated herein by reference....

> The proposed action is needed to allow Maritech Resources, Inc. to comply with OCSLA regulations 30 CFR § 250.1703 and § 250.1725.... According to the operator, the structures will be removed because reserves are depleted and there is no further utility. *Maritech Resources, Inc. , 2012*.
>
> . . .

> The alternative to the proposed structure removals as originally submitted is non-removal. Non-removal of the structures would represent a conflict with federal legal and regulatory requirement, which mandate the timely removal of obsolete or abandoned structures within a period of one year after terminations of the lease, or upon termination of a right-of-use and casements. Therefore, non-removal is not an acceptable alternative.

*R. 47-15*. In the December 13, 2012 Federal Register, public notice was given that the

VR 250-C was scheduled for "Structure Removal." Federal Register, Vol. 77, No.

240, December 13, 2012, Notices. *R. 47-14.* Hence, there is no question that by

December 2012, Tetra/Maritech's VR 250-C Platform was permitted by federal

regulations to be decommissioned and removed.

In correspondence from Maritech to the U.S. Department of the Interior,

Bureau of Safety and Environmental Enforcement "BSEE", dated June 13, 2014 (one

week before the CB&I work crew arrived on June 20, 2014), Maritech requested that

the daily pollution inspection of the Vermilion 250-C Platform required under 30

CFR 250.301(a), be waived and inspections be performed on a monthly basis because

"[t]he platform is out of service. The wells have been plugged and abandoned. All hydrocarbons have been drained from tanks and vessels." *R. 47-6.* Also, correspondence from counsel for Tetra/Maritech to counsel for CB&I states, "the platform was out of service and the wells had been plugged and abandoned prior to the accident date." *R.47-11.* Thus, there is no question that the VR 250-C Platform had been involved in exploration /production activities and was designed for use on particular wells.

Tetra/Maritech argues that *Tetra Technologies*, does not apply to this case because CB&I's MSA and work order did not call for the deconstruction or removal of a platform or a well by CB&I. In support of its position, Tetra/Maritech states that the affidavit of Rusty Barousse, Vice President of CB&I, contains nothing "that suggests he has any personal knowledge of Tetra/Maritech's internal business discussions or its motive for calling out CB&I." *R. 82, p. 3.* Barousse's affidavit, however, clearly states that he has been the Vice President of CB&I since July 2001 and has the authority to make statements concerning the business operations of the company and to do so based on his "own personal knowledge and belief." *R. 47-7.* As to Tetra/Maritech unsupported assertions, Barousse attests:

> That CB&I was contacted by Tetra prior to June 24, 2014 and asked to provide personnel to perform general construction services on the Vermilion VR 250-C Platform to include repair and replacement work as to the platform's grating and hand railings in order to bring the platform into regulatory compliance so that salvage and removal operations of the oil well platform could continue.

*Id., No. 5.*

The deposition testimony of the plaintiff supports Barousse's testimony. The

plaintiff testified that the Platform was to be "removed from the water" —"the heliport had already been torn down"—but "MMS had gone and written up some issues concerning stairwell treads and handrails and grating.... It had bad spots that they were written up for that needed to be replaced... we were going to fix it up to where they had access until they went back to remove it....." *R. 47-3, pp. 42-43.* The plaintiff confirmed that the CB&I crew were there "to make the platform safe for the workers who were going to follow." *Id. at p. 99.* He further confirmed that the CB&I work was part of a bigger plan of Maritech or Tetra to decommission the platform:

> Because BSEE went over there and wrote them up, because of the hand – because that, they had to have access and egress until that platform got pulled from the water. And that's why we were there. Because – to make that accessible until it did get pulled.

*Id. at p. 141.* Finally, Tetra/Maritech own correspondence states that the CB&I crew were performing "work preparatory to removal of the platform structures." *R. 47-11.*

In *Verdine,* a platform owner hired a contractor to refurbish a platform that was not participating in the exploration, production, or transportation of oil or gas and was instead sitting idle. *Verdine,* 255 F.3d at 253. The Fifth Circuit rejected the argument that the parties' agreement did not "pertain to a well," and concluded that a sufficient nexus to a well arose because the platform was being refurbished for use in future oil exploration. The court explained,

> The Louisiana legislature clearly envisioned the Act's application to agreements for services on structures that were not developing, producing or transporting oil or gas or geographically connected to a specific well. We do not interpret the legislature's requirement that an agreement pertain to a well in such a restrictive manner that we overlook agreements to which the Act was intended to apply. The Act encompasses agreements for services on structures intended for the use in the

oil and gas industry, so long as the agreement pertains to a well or wells.

*Id*. at 253. While the platform was decommissioned at the time of the contract performance, it was nevertheless "designated for use on particular wells" and "intended for use in the exploration of oil and gas production." *Id. at 254. See Labove v. Candy Fleet, L.L.C.*, 2012 WL 3043168, at *6 (E.D.La. July 20, 2012) (characterizing Verdine as "holding that a contract for repairs on a dismantled fixed oil platform rig pertained to a well because services rendered were performed on a structure intended for future use in the exploration and production of oil and gas"). Just as the decommissioned platform in *Verdine* pertained to a well because refurbishing or repairs were being done to reinstate its use in oil and gas exploration and production, the repairs on the decommissioned Platform in this case were being done to comply with regulations allowing the dismantling process to be completed.

*Howell v. Avante Servs., LLC*, 2013 WL 1681436, at *3–7 (E.D.La. Apr. 17, 2013) involved an agreement to cut and pull casings from the wellbores on an oil platform in which the well head had been removed. The work was part of a plan to "plug and abandon" the oil well and the "plugging" was a separate phase of the operation that was already completed when the work was carried out. *Id. at *1, *4.* The court held that removing the casings from the wellbore was "collateral to plugging the well" and covered under a straightforward reading of LOIA. *Id.* The court also observed that removing the casings could not be "logically severed from the overall plug and abandonment operation." *Id. at *8.* Here too, when the work at issue was being done the plugging had been completed in a separate phase of the

operation and the oral order to make repairs to the decommissioned Platform was part of the preparation for its dismantling. Just as in *Howell*, this was an act "collateral" to "repairing, improving, testing ... altering, plugging, or otherwise rendering services in or in connection with any well" and such required action could not be completed without such repairs.

The evidence reveals that the repair and replacing of handrails required for the removal crew to continue dismantling of the VR 250-C Platform was a necessary part of the overall operation required under the OCSLA regulations and Tetra/Maritech's structure removal permit. Applying the analysis of the court in *Tetra Technology*, as well as the reasoning of *Verdine* and *Howell* to the oral agreement and work in this case, the Court finds that the Tetra/Maritech–CB&I Agreement pertains to a well.

Tetra/Maritech argues that the holding in *Tetra Technologies* does not eliminate the relevancy of the *Transcontinental* test to the agreement in this case. Tetra/Maritech provides nothing to dispute CB&I's statement that "the agreement pertains to a well under the *Transcontinental* analysis" other than its own statement that "there is no evidence of a functional nexus between CB&I's work and a particular well or wells." *R. 71, p. 3.* The Court finds that application of the factors results in the determination that the agreement between Maritech and CB&I pertained to a particular well.

The Fifth Circuit has noted that when, as here, the contract at issue does not concern the transportation of oil or gas, some of the *Transcontinental* factors are not relevant. *Broussard v. Conoco, Inc.*, 959 F.2d 42, 44–45 (5th Cir.1992); *see also*

*Verdine*, at 253, *Howell*, at *5. Some factors remain relevant, such as: (1) whether the structures or facilities to which the contract applies are part of an in-field gas gathering system; (2) the geographical location of the facility or system relative to the well or wells; (3) the function of the facility or structure in question; (4) who owns and operates the facility or structure in question; and (5) any number of other details affecting the functional and geographic nexus between a well and the structure or facility that is the object of the agreement. *Id.* at 253. The record supports: (1) the VR 250-C Platform was part of oil and gas producing wells/in-filed gas gathering system[10]; (2) the well(s) was/were located on the VR 250-C Platform[11]; (3) the function of the VR 250-C was as a fixed platform for oil and gas exploration and production[12]; (4) the VR 250-C was owned by Maritech, a subsidiary of Tetra[13]; and (5) CB&I personnel were repairing and replacing handrails on the VR 250-C Platform stairs and performing similar general safety work preparatory to removal of the platform structures.[14]

These factors support finding that the agreement pertained to a well. Tetra/Maritech, an exploration and production company, owned the VR 250-C

---

[10] *R. 47-6* ("The wells have been plugged and abandoned. All hydrocarbons have been drained from tanks and vessels."); *R. 47-11* ("the platform was out of service and the wells had been plugged and abandoned"); *R. 47-15* ("The operator will remove all casing, wellhead equipment, and piling ....")

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *R. 47-11, p. 2.*

Platform which had been out of service and the wells had been plugged and abandoned. Pursuant to OCSLA regulations 30 CFR § 250.1703 and § 250.1725, Tetra/Maritech was required to remove the decommissioned/obsolete Platform. *R. 47-15*. Thus, as the Platform is related to wells, albeit wells which had been plugged and abandoned, there is a functional nexus between the object of the agreement, repairing and replacing handrails on the Platform preparatory to its removal, and the well itself. Accordingly, the agreement related to a well under the *Transcontinental* test.

<h3 style="text-align:center">*IV. Conclusion*</h3>

Because LOIA applies to the Agreement, CB&I's obligations to defend and indemnify provisions of the MSA are voided. La.Rev.Stat. Ann. § 9:2780(B), (G). Accordingly, for the above reasons, CB&I's Motion For Summary Judgment will be GRANTED.

**THUS DONE AND SIGNED** this 26th day of September, 2017.

CAROL B. WHITEHURST
UNITED STATES MAGISTRATE JUDGE